## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MITCHELL WAX, Individually and on behalf of All Others Similarly Situated,<br><br>                            Plaintiff,<br><br>    v.<br><br>CROSS RIVER BANK,<br><br>                            Defendant | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Mitchell Wax ("Plaintiff"), individually and on behalf of all others similarly situated, by undersigned counsel, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of: (a) regulatory filings by Defendant Cross River Bank ("CRB"), including with the Federal Deposit Insurance Corporation ("FDIC"); (b) documents related to Sunlight Financial Holdings, Inc.  f/k/a Spartan Acquisition Corp. II ("Spartan"), including, among others, documents filed with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other public statements disseminated by CRB and Sunlight; (d) court filings relating to actions against Sunlight, CRB, and others; and (e) other publicly available information.

### NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all persons who purchased or otherwise acquired the securities of Sunlight and/or Spartan (collectively, "Sunlight") between January 25, 2021 and October 31, 2023, inclusive (the "Class Period"). The action is filed against CRB, Sunlight's purported "Bank Partner," as that term is used in Sunlight's SEC filings, for violations of the Securities Exchange Act of 1934 (the "1934 Act"). As set forth below, Defendant

1

violated Section 10(b) of the 1934 Act by engaging in a plan or scheme that, to the extreme detriment of Sunlight investors, enabled Sunlight to originate and conceal from its investors a large pool of loans to unscrupulous solar panel installers of dubious credit quality, and a massive amount of funded but unsold mispriced solar loans that CRB warehoused "off balance sheet" – that is, loans for which Sunlight retained full economic exposure until those loans were sold, but which were not reflected on Sunlight's balance sheet.

2. CRB had every incentive to engage in the fraudulent scheme described above. CRB earned substantial profits from loans to borrowers of dubious credit quality for which it had no risk of loss, as Sunlight retained all of the economic risk. In addition to the substantial fees CRB charged to borrowers as a lender, Sunlight also paid CRB, as its Bank Partner a fee based on the principal balance of loans originated by CRB. Thus, CRB benefitted financially on multiple fronts as the volume of loans it made increased.

3. Unbeknownst to Plaintiff and other Sunlight investors, CRB allowed Sunlight to amend the Program Agreement (and other lending agreements) between the parties in a way which dramatically increased Sunlight's exposure to the mispriced, off-balance sheet loans as interest rates rose during 2021 and 2022. CRB repeatedly facilitated that rapid increase, allowing Sunlight to exceed the lending limits in its lending agreements with CRB in order to charge substantial fees to borrowers as a lender, in addition to the fee Sunlight was obligated to pay to CRB based on loan volume.  CRB's scheme to allow Sunlight to exceed its lending limits just as interest rates were rising was inherently fraudulent and designed solely to enrich CRB.

4. Sunlight was at all relevant times a technology-enabled point-of-sale financing platform that, during the Class Period, provided residential solar and home improvement contractors the ability to offer point-of-sale financing to those contractors' customers when

2

purchasing residential solar systems or certain other home improvements. Such loans were funded by Sunlight's capital providers and facilitated by Sunlight's proprietary technology platform, Orange, through which Sunlight offered instant credit decisions to homeowners nationwide at point-of-sale on behalf of Sunlight's capital providers.

5.      During the Class Period, Sunlight categorized its capital providers as being either Sunlight's "direct channel" or "indirect channel." Direct channel capital providers fund Sunlight-facilitated solar or home improvement loans one-by-one directly onto their balance sheet via Orange. Sunlight's direct channel capital providers were depository institutions with the power and authority to originate loans, such as banks and credit unions. Generally, direct channel capital providers choose to service the loans they originate.

6.      In the indirect channel, Sunlight's allocation engine directed that certain solar and home improvement loans be funded on the balance sheet of Sunlight's Bank Partner, CRB, under the terms of loan agreements with CRB. Those loans were aggregated, pooled, and sold to indirect channel capital providers that could not, or did not wish to, directly originate solar loans. CRB, as Sunlight's Bank Partner, was Sunlight's only indirect channel provider.

7.      During the Class Period, CRB engaged in a scheme to extend loans to disreputable solar contractors of dubious credit quality and facilitate Sunlight's accumulation of a large loan pools of fixed-rate loans on CRB's balance sheet for which Sunlight retained the risk of loss. These loans contained enormous levels of risk of default and interest rate risk for Sunlight, but Sunlight lacked the necessary capital to tolerate a default or significant rise in interest rates. Neither Sunlight nor CRB disclosed to Plaintiff and the Class the magnitude of that risk or, when interest rates increased, the extent of Sunlight's mounting off-balance sheet liabilities (which were being warehoused on the balance sheet of Sunlight's Bank Partner, CRB). Instead, CRB repeatedly and

intentionally (or at a minimum, extremely recklessly) allowed Sunlight to far exceed the credit limits in its lending agreements with Sunlight, and, in furtherance of its fraudulent scheme, CRB worked with Sunlight to amend those agreements after the fact to allow for the increased amounts to avoid a default under the agreements.

8.      As interest rates continued to rise throughout 2022, Sunlight, in an apparent attempt to keep growing its unsustainable lending and keep its margins and volumes intact, kept interest rates on loans to its customers at depressed and economically unviable rates. Predictably, Sunlight was unable to sell those loans to the direct channel because its existing loan buyers would not purchase such low-interest loans at a price that was profitable to Sunlight. Consequently, Sunlight turned to its indirect channel Bank Partner, CRB, and dramatically increased the magnitude of what was later identified as the CRB "Backbook," by amassing an enormous amount of loans that were mispriced at below-market interest rates and/or at fixed interest rates, all of which were quickly decreasing in value as interest rates continued to rise. As a result, these loans were unsellable other than at a steep discount.

9.      As CRB knew, Sunlight had a minimal equity cushion to absorb the level of liability risk it was building, and CRB's repeated extensions of credit beyond then-existing lending limits prescribed in the agreements between enabled Sunlight to conceal from investors that Sunlight's capital was rapidly eroding and the liabilities warehoused on the CRB Backbook were skyrocketing. For its part, Sunlight consistently omitted the size of the Backbook from its public filings until it was too late.

10.     CRB's repeated extensions of credit and agreement to help Sunlight conceal its true indebtedness from investors by having it recorded in CRB's books, coupled with Sunlight's false statements about its true loan exposure, kept Sunlight's true financial distress a secret from

investors, which kept the price of Sunlight's shares artificially inflated during the Class Period. For example, Sunlight's stock closed at $2.57 per share on September 27, 2022.

11.    Then, on September 28, 2022, investors first began to learn Sunlight's true financial picture. On that date, Sunlight announced that it was taking a non-cash advance receivable impairment of $30 to $33 million stemming from liquidity issues by one installer. Sunlight's stock price plummeted 57%, or $1.44 per share, on the news, falling from a closing price of $2.52 per share on September 28, 2022 to a close of $1.08 per share on September 29, 2022.

12.    Then, on December 13, 2022, Sunlight filed a Current Report on Form 8-K with the SEC announcing a Fifteenth Amendment to the Existing Solar Loan Program Agreement and Ninth Amendment to the Existing Home Improvement Program Agreement with its Bank Partner CRB which provided for, among other things, a ***more than doubling*** of the loan capacity CRB was willing to extend to Sunlight, from $210 million to $450 million. This meant that CRB had enabled Sunlight to vastly exceed – by more than double – the credit limits imposed in prior agreements. CRB thus had used such a deceptive device and/or artifice for no purpose other than to conceal Sunlight's exposure to its loan portfolio, thereby benefitting CRB in terms of substantial fees to borrowers as a lender, in addition to the fees Sunlight was obligated to pay CRB based on loan volume. On that news, shares of Sunlight fell more than 6%, or $0.12 per share, from a closing price on December 13, 2022 of $1.81 per share to a close of $1.69 per share on December 14, 2022.

13.    Next, on March 17, 2023, Sunlight filed a Notice of Late Filing of its Annual Report with the SEC, revealing that it anticipated a significant change in its financial results for the fiscal year ended December 31, 2022, compared to the fiscal year ended December 31, 2021. resulting primarily from the deterioration in the market for sales of Sunlight's indirect channel loans funded

by, and held on the balance sheet of, Sunlight's Bank Partner CRB, for which Sunlight retained economic exposure. This Notice of Late Filing sent Sunlight's share price reeling. Shares fell from a closing price of $0.57 per share on March 16, 2023 to a closing price on March 17, 2023 of $0.42 per share – a decline of $0.15 per share, more than 25%. The impact continued into the next trading day, as shares closed at $0.30 per share on March 20, 2023, a decline of $0.12 per share, or more than 28%. At the same time, however, the filing did not reveal any information about the magnitude of Sunlight's economic exposure to those Backbook loans and thus did not fully disclose CRB's scheme.

14.     On April 3, 2023, Sunlight announced that CRB increased its loan capacity yet again from $450 million to *$650 million* as of April 2, 2023.

15.     Then, on May 4, 2023, Sunlight filed its delayed Annual Report with the SEC on Form 10-K. In that 10-K, Sunlight quantified for the first time the losses stemming from the Backbook loans, revealing that Sunlight could incur negative platform fees *between $45.0 million and $55.0 million* in connection with a portfolio of funded but unsold loans held by Sunlight's Bank Partner CRB at March 31, 2023.

16.     Also, on May 4, 2023, Sunlight issued an earnings release that revealed that, as of March 31, 2023, Sunlight's CRB warehouse facility balance was a staggering ***$764 million***, far in excess of the then-current lending cap of $450 million.  While Sunlight also announced that the balance had been reduced by a $296 million sale of Indirect Channel loans in April 2023, even with that sale, the Backbook balance stood at $468 million, above the prior $450 million limit. The effect of the sale merely brought the balance within the new, increased $650 million limit announced on April 3, 2023. These partial disclosures caused Sunlight's shares to decline by more

than 4% on May 4, 2023, closing at $0.43 per share that day, down from a May 3, 2023 close of $0.45. Shares fell an additional 6% on May 5, 2023, closing at $0.40 per share.

17.    Just eleven days later, on May 15, 2023, Sunlight filed its delayed quarterly report with the SEC on Form 10-Q and issued an earnings release that tried to downplay Sunlight's dire financial picture and business prospects. The earnings release quoted Sunlight's CEO Matt Potere as stating that he was "pleased we completed the Financing Agreements with [Bank Partner CRB] which position us to resolve our challenges from last year by strengthening our liquidity and enabling us to resume Indirect Channel loan sales. . ." Potere further touted that in the first quarter of 2023, Sunlight funded an additional $627 million of solar and home improvement loans, "up 6% from the prior year period." On this announcement, Sunlight's shares fell $0.02 per share, or 5%, from a closing price of $0.38 per share on May 15, 2023 to a close of $0.36 per share on May 16, 2023.

18.    Thereafter, Sunlight's financial picture rapidly spiraled downward. On August 9, 2023, Sunlight's quarterly report with the SEC on Form 10-Q for the quarter ending June 30, 2023 revealed that its net tangible assets were negative by approximately $37 million. This meant that Sunlight was essentially insolvent. On this news, Sunlight's shares plummeted from a closing price of $0.39 per share on August 9, 2023 to a closing price of $0.23 on August 10, 2023 – a decline of $0.16 per share, or more than 40%.

19.    On August 23, 2023, Sunlight announced a 1 for 20 reverse stock split.

20.    On September 13, 2023, Sunlight announced yet another amendment of its agreements with its Partner Bank CRB whereby CRB had waived certain provisions of its prior loan agreements, including certain cash payments due on October 31, 2023; a waiver of certain repurchase obligations; a waiver of certain consequences of a Sunlight default of the agreements;

revisions to requirements of certain loan sales; and revisions to the provisions that require Sunlight to maintain certain cash balances in its accounts with CRB.

21.    On September 28, 2023, Sunlight announced that it was suspended from trading and delisted by the New York Stock Exchange ("NYSE") as of September 25, 2023.

22.    Finally, on October 31, 2023, investors fully learned of CRB's fraudulent scheme, as on that date, Sunlight announced it had filed for Chapter 11 bankruptcy with a pre-packaged plan whereby **CRB** would provide exit financing in return for 12.5% of the New Equity in the reorganized company. Under the plan, the interests of Plaintiff and the other common stockholders of Sunlight were extinguished. On this news, shares of Sunlight fell $0.13 per share, or 34%, from a closing price of $0.38 per share on October 30, 2023 to a close of $0.25 per share on October 31, 2023.

23.    As set forth herein, CRB, as Sunlight's Bank Partner, repeatedly extended enormous amounts of credit to Sunlight and its unscrupulous solar panel installers of dubious credit quality, even as interest rates rose and Sunlight's financial condition deteriorated. CRB further increased its loan limits and enabled Sunlight to exceed those limits, and held such loans on its own balances sheet, thus knowingly allowing and enabling Sunlight to hide its exposure to the solar Backbook from its investors. All such conduct was employed for no legitimate purpose other than for CRB to benefit itself in terms of the substantial fees it charged to borrowers as a lender, as well as the fees Sunlight was obligated to pay to CRB based on loan volume. Thereby, CRB knowingly employed a device, scheme, or artifice to defraud Sunlight investors, and engaged in an act, practice or course of business which operated as a fraud or deceit upon those investors. CRB's scheme deceived the investing public as to Sunlight's business and prospects, artificially inflated the price of Sunlight common stock, and caused Plaintiff and the other members of the

Class (as defined below) to purchase Sunlight stock at artificially inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## JURISDICTION AND VENUE

24.     Jurisdiction is conferred by Section 27 of the 1934 Act, 15 U.S.C. §78aa. The claims asserted herein arise under Section 10(b) of the 1934 Act, 15 U.S.C. §§78j(b) and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

25.     Venue is proper in this District pursuant to Section 27 of the 1934 Act. Defendant is a New Jersey incorporated bank with its main offices in this District. The violations of law complained of herein occurred in part in this District, and the lending agreements between CRB and Sunlight that give rise to this action were entered into in this District.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

27.     Plaintiff Mitchell Wax purchased shares of Sunlight stock during the Class Period, as described in the Certification filed herewith and incorporated by reference. Plaintiff has suffered damages in connection with his purchase of Sunlight stock. Plaintiff is a citizen and resident of the State of Arizona.

28.     Defendant CRB is a New Jersey incorporated bank with its main address at 885 Teaneck Road, Teaneck, New Jersey 07666. CRB was established in 2008 per the FDIC and is a subsidiary of CRB Group, Inc. a New Jersey corporation with its business address at 400 Kelby Street, Fort Lee, New Jersey 07024.

**RELEVANT NON-PARTY**

29.    Relevant non-party Sunlight was a technology-enabled point-of-sale financing platform that provides residential solar and home improvement contractors the ability to offer point-of-sale financing to those contractors' customers when purchasing residential solar systems or other home improvements. The resulting loans were funded by Sunlight's capital providers facilitated by Sunlight's proprietary technology platform, Orange through which Sunlight offered instant credit decisions to homeowners nationwide at point-of-sale on behalf of Sunlight's capital providers.

**FACTUAL ALLEGATIONS**

<u>Background</u>

30.    Sunlight was formed in 2020 when Spartan initiated an initial public offering ("IPO") of securities.

31.    On January 25, 2021, Spartan and a company known as Legacy Sunlight announced a business combination. The combined company would be known as Sunlight Financial, Inc.

32.    On July 8, 2021, Spartan shareholders approved the combination, and on July 12, 2021, Sunlight common shares began training on the NYSE under the symbol "SUNL".

<u>Sunlight's Business</u>

33.    According to Sunlight's public statements, Sunlight:

- Offered solar contractors with point-of-sale (POS) financing to customers;

- Revenue came from a "platform fee" from each loan facilitated;

- Sunlight did not advertise or conduct outreach to homeowners and relied on contractors to tell customers about financing;

- Sunlight did not have exclusivity agreements with contractors;

- To make money, Sunlight had to convince contractors to use the Sunlight financing platform;

- Sunlight differentiated itself by offering generous cash advances to contractors;

- Whereas generally in industry, loans are funded after contractor finished, Sunlight's generous cash advance program was a differentiator.

34.    According to Sunlight's public filings with the SEC, Sunlight arranged for the origination of loans by third-party lenders in two distinct ways:

Direct Channel Loans – to be originated and retained by Direct Channel Partners. The Direct Channel partners originate the Direct Channel Loans directly using their own credit criteria. They remit funds to Sunlight and Sunlight makes payments to relevant contractor. Sunlight earns difference between cash paid to Sunlight by the lender and the amount given to contractor.

Indirect Channel Loans—Sunlight arranges for Loans to be originated by Sunlight's issuing Bank Partner. Sunlight entered into program agreements with Bank Partners. Sunlight pays its Bank Partner a fee based on balance of Loans originated by the Bank Partner. The Bank Partner funds loans by remitting funds to Sunlight, and Sunlight is responsible for making payments to the contractor. Sunlight arranges for sale of Indirect Channel Loans to third party purchasers.[1]

35.    Initially, most of Sunlight's loans were Direct Channel Loans sold directly to third-party financial institutions, whereas a minority of the loans were Indirect Channel Loans originated by Sunlight's Bank Partner, Defendant CRB. However, that mix changed dramatically as interest rates rose starting in 2021.

36.    Regarding those Indirect Channel loans, Sunlight's public filings explained:

Revenue Recognition—Sun recognizes revenue from (a) platform fees on Indirect Channel Loans when the Indirect Channel Purchaser buys the Loans from the balance sheet of the Bank Partner, and loan portfolio and management services monthly as Sun provides such services.

---

[1] From Sunlight's quarterly report on Form 10-Q/A for the quarter ending September 30, 2021 filed with the SEC on November 19, 2021.

\*      \*      \*

Sunlight is required to guarantee the performance of certain Indirect Channel Loans, which it is required to repurchase in the event Sunlight is unable to facilitate the sale of such loans. . .

\*      \*      \*

*Funded Loans*. Sunlight refers to the aggregate principal balance of the loans facilitated through Orange®, and funded by Sunlight's capital providers, during a given period, as "funded loans." . . . In the indirect channel, Sunlight's solar loan allocation engine directs the solar loans to be funded on the balance sheet of Sunlight's intermediary bank partner. These loans are aggregated, pooled and sold to indirect channel capital providers that cannot, or do not wish to, directly originate solar loans. . .

37.    Sunlight's public filings explained the following regarding Sunlight's relationships with its capital providers:

. . . Sunlight earns a platform fee on each solar and home improvement loan facilitated through Orange®. The platform fee is generally equal to the difference, or the margin, between (i) the contractor fee that Sunlight charges to contractors for access to Orange® and for making the various Sunlight-offered loan products available to such contractors and (ii) the capital provider discount charged by the relevant capital provider either funding or purchasing the loan in the direct and indirect channels, respectively (as described below). .                                                                                                                                        .

Sunlight engages with its capital providers not just as funding sources but as funding partners. As with Sunlight's network of contractors, Sunlight works closely with its capital providers to understand and address their business needs as related to the residential solar loan industry. Matters related to loan product, credit strategy, contractor commercial underwriting and consumer protection practices are considered and designed in tandem with the goal of creating a robust and growing channel for funded loan volume. . .

\*      \*      \*

In the indirect channel, Sunlight's solar loan allocation engine directs the solar loans to be funded on the balance sheet of Sunlight's intermediary bank partner. These loans are aggregated, pooled and sold to indirect channel capital providers that cannot, or do not wish to, directly originate solar loans. . .

38.    Specifically, regarding Platform Fees, Sunlight's public filings explained:

. . . These loans are facilitated by Sunlight's proprietary technology platform, Orange®, through which Sunlight offers instant credit decisions to homeowners nationwide at the POS on behalf of Sunlight's various capital providers. Sunlight recognizes platform fees

as revenues at the time that direct channel partners or indirect channel loan purchasers obtain control of the service provided to facilitate their origination or purchase of a loan, which is no earlier than when Sunlight delivers loan documentation to the customer. Sunlight wholly satisfies its performance obligation to direct channel partners, bank partner and indirect channel loan purchasers upon origination or purchase of a loan. . .

Sunlight is obligated to repurchase non-performing loans originated by its bank partner from the date of origination to the date the loans are purchased from Sunlight's bank partner by a Sunlight indirect channel capital provider. Sunlight does not record loans originated by its bank partner on its consolidated balance sheets (as Sunlight is not the originator of the loans), but Sunlight does record a liability for the losses Sunlight reasonably expects to incur in connection with Sunlight's guarantee of its bank partner. . .

39.     Regarding its economic exposure to losses, the public filings explained:

Currently a portion of solar system loans originated through Sunlight's Platform . . . are funded by Sunlight's bank partnership arrangement whereby loans are originated by Sunlight's bank partner but held for sale to a third party. The terms of Sunlight's bank partnership arrangement provide that such sales must occur within a certain period of time, subject to certain exceptions (180 days from origination for solar system loans . . . While Sunlight has not been required to date to purchase solar system loans from its bank partner due to the expiration of Sunlight's bank partner's agreed hold period, Sunlight cannot be certain that fluctuations in the credit markets or other market, regulatory or business factors will not impede Sunlight's ability to source such third-party purchasers in the future, which could result in Sunlight being required to purchase all or part of unsold solar system loans. Sunlight's arrangements with its bank partner also require that Sunlight purchase solar loans when subject to charge-off by Sunlight's bank partner. . .

40.     Significantly, Sunlight's public filings reveal that:

Sunlight acts as the administrator for its bank partner's portfolio of Sunlight-facilitated loans, and Sunlight has access to comprehensive daily reporting regarding those loans, which allows it to track the status of loans, including days from origination, and monitors the performance of those loans on a loan-level basis.

Sunlight has entered into committed indirect funding program agreements with capital providers for the purchase of solar system and home improvement loans from Sunlight's bank partner. . . In addition, Sunlight's indirect funding program agreements contain covenants and agreements relating to the origination of such loans and Sunlight's financial condition. . . Such covenants and agreements generally include, among others, obligations related to funding volumes, concentration limits on certain loan products, Fair Isaac Corporation ("FICO") score requirements, agreements related to Sunlight's legal compliance in the origination process, underwriting requirements and milestone or other payment requirements. . .

41.     Thus, while CRB is the "owner" of the Indirect Channel Loans until the loans are sold to purchasers, Sunlight retained full economic exposure to the Backbook until the loans were sold, and only profited when the price that the loan purchaser paid for the Indirect Channel Loans exceeded CRB's cost basis in the loans. Sunlight incurred a loss, however, when the price that such purchasers paid for the Indirect Channel Loans was less than CRB's cost basis in the loans, as CRB knew.

42.     In addition, the Backbook was highly sensitive to fluctuations in interest rates and other macro-economic factors, which left Sunlight exposed to significant losses when interest rates rose in the absence of an interest rate hedge to protect from such losses. Even though Sunlight was exposed to the economic risk of the Backbook, the Indirect channel Loans were warehoused "off balance sheet" on CRB's balance sheet until they were sold.

43.     Sunlight further segregated its Backbook into solar loans ("Solar Backbook") and home improvement loans (Home Improvement Backbook"). Only Sunlight's Home Improvement Backbook, however, was considered a derivative subject to Fair Market Value accounting. Thus, while the Solar Backbook massively outweighed the Home Improvement Backbook, only the Home improvement Backbook had to reflect fair market value changes on Sunlight's financial statements. As Sunlight's SEC filings reveal:

Sunlight has entered into two agreements considered derivatives under GAAP that are subject to interest rate, credit, and/ or prepayment risks. . .

In January 2019, Sunlight entered into an agreement with its Bank Partner to arrange Loans for the purchase and installation of home improvements other than residential solar energy systems. . .

In February 2021, Sunlight entered into an agreement with an Indirect Channel Loan Purchaser to purchase Loans for the installation of home improvements other than residential solar energy systems. . .

Sunlight's derivative asset is recorded at fair value in the accompanying Condensed Consolidated Balance Sheets. . .

44.    To the contrary, however, the Solar Backbook was deemed not to be derivative, and thus not subject to Fair Market Value accounting. This meant that any fair value changes in the Solar Backbook would go unaccounted for on Sunlight's financial statements and concealed from Sunlight's stockholders. Sunlight's lack of transparency, in combination with CRB's fraudulent scheme alleged herein, left Plaintiff and the other Sunlight stockholders in the dark about the rapid deterioration of the Solar Backbook.

**The Scheme to Deceive Sunlight Investors**

45.    Between January 25, 2021 and October 31, 2023, CRB knowingly (at a minimum, extremely recklessly) engaged in a scheme to deceive Sunlight investors which artificially inflated the price of Sunlight stock and operated as a fraud or deceit on purchasers of Sunlight stock. Specifically, CRB knowingly facilitated loans to disreputable solar contractors of dubious credit quality, as well as the build-up of an enormous Backbook of high-risk Indirect Channel Loans Defendant warehoused for Sunlight on CRB's balance sheet but for which Sunlight retained the risk of loss.

46.    Since at least 2018, CRB was Sunlight's Indirect Channel Bank Partner, regularly providing financing through Sunlight for consumers' purchases of solar power systems from solar contractors. This included providing financing for customers of two of Sunlight's primary vendors, Power House Solar, LLC d/b/a Pink Energy ("Pink Energy") and Vision Solar, LLC ("Vision Solar"). Critically, both Pink Energy and Vision Solar were subject to numerous consumer complaints and lawsuits nationwide, and moreover, were the subject of investigations and lawsuits by numerous state Attorneys General for their illicit business practices. For example, a November 22, 2022 letter to, among others, CRB and Sunlight from Pennsylvania Attorney General Josh

Shapiro and the Attorneys General of the Commonwealth of Kentucky, the States of North Carolina, Illinois, Indiana, Michigan, South Carolina, Tennessee, and the Commonwealth of Virginia, the Attorneys General notifying the recipients that Pink had been under investigation and/or litigation by the undersigned Attorneys General for suspected violations of state consumer protection laws as well as applicable federal and state regulations, noted that CRB and others "regularly provided financing for consumers' purchases of solar power systems from Pink."

47.     Similarly, a series of class action lawsuits were filed against Vision Solar in 2020 and 2021, alleging that it recruited customers through a telemarketing scam, and in 2023, the United States and the State of Arizona filed an action against Vision Solar and its telemarketing partners alleging the same pattern of activity as alleged in the class action lawsuit.

48.     Pursuant to the scheme described herein, CRB, as Sunlight's Bank Partner, knowingly granted ever-increasing amounts of credit to Sunlight and its contractors (including Vision Solar and Pink), repeatedly lifted its loan caps, and waived defaults under its agreements with Sunlight, all with knowledge that such defaults and Sunlight's unsustainable debt load were being concealed from Sunlight's investors. CRB engaged in these inherently fraudulent transactions for no legitimate purpose other than to enrich itself with substantial fees as a lender, as well as the fee Sunlight was obligated to pay to CRB based on loan volume.

**The Truth Is Revealed in a Series of Partial Disclosures**

49.     On September 28, 2022, Sunlight investors were first tipped off as to CRB's scheme when Sunlight filed a Current Report with the SEC on Form 8-K. In that filing, Sunlight announced that it was taking a non-cash advance receivable impairment of $30 to $33 million based on liquidity issues by one installer, later identified as Pink. Sunlight's stock price plummeted 57%, or

$1.44 per share, on the news, falling from a closing price of $2.52 per share on September 28, 2022 to a close of $1.08 per share on September 29, 2022.

50.    On November 14, 2022, Sunlight filed its quarterly report with the SEC on Form 10-Q for the quarter ending September 30, 2021 ("3Q10-Q"), and after the market closed, issued an earnings release and held an investor conference call. Those reports revealed for first time, that rising interest rates were having a material negative impact on Sunlight's existing loan portfolio. Sunlight, however, did not quantify the impact or reveal the existence of the CRB Backbook.

51.    More specifically, Sunlight's 3Q10-Q stated the following:

*Impact of Rapid and Significant Increase in Interest Rates.* During the second and third quarters of 2022, interest rates have increased rapidly and significantly. The macro-economic impact of these significant interest rate increases will have a material impact on Sunlight's business, profitability and cash-flow in the near term until the significant pricing increases Sunlight has implemented over the past several months take effect. First, these rapid interest rate increases have resulted in a significant shift in reliance from Sunlight's Direct Channels to its Indirect Channel, which is less profitable and creates additional risk of changing rates between the time that the underlying Indirect Channel loan is processed at a lower interest rate to a later time when Sunlight is able to monetize Indirect Channel loans after interest rates have increased. As a result, Sunlight expects to incur significant losses relating to its current portfolio of Indirect Channel loans because of this interest rate gap. In response to rapidly rising interest rates, Sunlight implemented several increases in dealer fees charged to contractors during the third quarter of 2022, for which Sunlight expects to facilitate platform fee loans that reflect those dealer fee increases starting in the fourth quarter of 2022.

52.    The 3Q10-Q further revealed that Sunlight's Board had initiated a review of "strategic alternatives," including a possible sale of the business:

*Board Initiates Review of Strategic Alternatives*. Sunlight is currently considering a range of strategic alternatives that may be available to Sunlight to maximize stakeholder value, including but not limited to financings, strategic alliances, or a possible business combination or sale of the business. Sunlight has engaged a financial advisory firm to help explore available strategic alternatives. Sunlight will only make further public comments once the Board has approved a specific transaction or otherwise concludes its review. While the results of the Strategic Alternatives review cannot be estimated until the review is completed, which is expected in 2023, implementation of recommendations resulting from such review could have a material impact on Sunlight's future results of operations,

financial condition and/or cash flows.

53.     Sunlight's November 14, 2021 earnings release, issued after the market closed,

attempted to paint a more rosy assessment of Sunlight's financial prospects noting:

> "While our earnings this quarter were negatively impacted by non-cash charges related to insolvency of an installer and goodwill impairment, our core performance was in line with our expectations."

54.     Then, on December 13, 2022, Sunlight filed a Current Report on Form 8-K with

the SEC announcing a Fifteenth Amendment to the Existing Solar Loan Program Agreement and

Ninth Amendment to the Existing H[ome]I[mprovement] Program Agreement with its Bank

Partner CRB providing for, among other things, a more than doubling of the loan capacity CRB

was willing to extend to Sunlight. The Form 8-K revealed:

- An increased cap on the total loans held by the Bank Partner at any time of $450 million (up from $210 million);
- The Bank Partner's continued commitment to timely fund any credit approved loan;
- A revised tiered fee structure;
- A revised distribution of payments in respect to each Bank Partner loan;
- The establishment of a deposit account that requires Sunlight to deposit as collateral an amount equal to 50% of the cost basis of any loan that is more than 60 days past due, with a minimum required balance of $1,000,000.

> In connection with the amendments, CRB, Sunlight's Bank Partner, agreed to an omnibus waiver of certain potential breaches and defaults under the Existing Bank partner Agreements by Sunlight through Jan. 31, 2023, including any required compliance with any applicable loan cap under the agreements.

55.     The Form 8-K further revealed that not only did CRB more than double Sunlight's

total loan capacity at a time when Sunlight's financials were materially and negatively impacted

by rapidly rising rates, but also that CRB and Sunlight were already out of compliance with that

new, increased cap. By violating its own lending caps, CRB thus exposed Sunlight to enormous

economic risk:

The Company will seek to sell a portion of the loans that the Bank partner currently holds by January 31, 2023 to facilitate the Company's compliance with the revised $450 million total loan cap under the Bank Party Agreements.

56.     The Form 8-K also, for the first time, revealed the existence of the Backbook:

*Impact of Sales of Certain Funded Indirect Channel Loans*

\*       \*       \*

The Bank Partner currently holds, pursuant to the Bank Partner Agreements, a portfolio of funded but unsold loans, a significant portion of which were credit approved prior to certain pricing actions that the Company took in the third and fourth quarters (such loans, "Backbook Loans"). Sunlight plans to sell a material portion of the Backbook Loans in December 2022 to comply with the Bank Partner Agreements and other similar agreements with capital providers. Losses associated with the sale of Backbook Loans are recorded by the Company as negative platform fees. As a result of the anticipated sale of a portion of the Backbook Loans in December, the Company expects that total platform fees in the fourth quarter will be in a range of $0 to $5 million as compared to approximately $31 million reported for the quarter ended September 30, 2022. After giving effect to the planned loan sales in December, the Company expects the aggregate principal amount of loans held by the Bank Partner pursuant to the Bank Partner Agreements will be $350 million to $400 million, of which $275 million to $300 million will be Backbook Loans. The Company expects to sell the remaining Backbook Loans in the first and second quarters of 2023 which may result in additional losses and negative platform fees.
The Company is actively working to minimize the negative impact of sales of the Backbook Loans on the Company's platform fee revenue, its cash balance and liquidity. However, losses of platform fee revenue in the fourth quarter of 2022 resulting from the December sale of the Backbook Loans will significantly reduce the Company's cash balance and may result in materially less available liquidity through the first half of 2023.

The additional impact of sales of the remaining $275 million to $300 million of Backbook Loans in the first half of 2023 on the Company's platform fee revenue and its cash balance and liquidity will depend on many factors (including prevailing market prices for Indirect Channel Loans at the time of the sales) and which could be mitigated by the results of the strategic alternatives process.

57.     In response to these disclosures, Sunlight shares declined 6%, or $0.12 per share, from a closing price on December 13, 2022 of $1.81 per share to a close of $1.69 per share on December 14, 2022.

58.     On March 14, 2023, Sunlight filed a Current Report on Form 8-K with the SEC announcing that Silicon Valley Bank, where Sunlight kept most of its unrestricted cash ($64

million out of $73.2 million), was closed by the California Department of Financial Protection and Innovation and the FDIC. The Form 8-K further reported that "[d]espite the completion of the previously disclosed loan sale in December 2022, the Company is currently not in compliance with certain provisions of the Bank Partner Agreements, including the total loan cap".

59.    On March 17, 2023, Sunlight filed a notice of late filing of its Annual Report with the SEC revealing that Sunlight anticipates a significant change in results of operations for the fiscal year ended December 31, 2022 compared to the fiscal year ended December 31, 2021, resulting primarily from the deterioration in the market for sales of Sunlight's Indirect Channel loans funded by, and held on the balance sheet of Sunlight's Bank Partner CRB, for which Sunlight retains economic exposure. However, the filing still did not reveal any information about the magnitude of Sunlight's economic exposure to those loans:

> The Company anticipates a significant change in results of operations for the fiscal year ended December 31, 2022 compared to the fiscal year ended December 31, 2021 resulting primarily from the deterioration in the market for sales of the Company's indirect channel loans funded by, and held on the balance sheet of, the Company's bank partner, for which the Company retains economic exposure. At December 31, 2022, a significant portion of such indirect channel loans were credit approved prior to certain pricing actions that the Company took in the third and fourth quarters of 2022 ("Backbook Loans"). In December 2022, in order to comply with agreements with its bank partner, the Company sold a portion of the Backbook Loans and recorded losses as negative platform fees. While the Company needs additional time for reviewing and completing its financial statements and related disclosures to be included in the Form 10-K, as a result of the sale of Backbook Loans, the Company expects to report losses on loan sales that significantly exceed such losses for the year ended December 31, 2021.

60.    This Notice of Late Filing caused Sunlight's shares to fall from a closing price of $0.57 per share on March 16, 2023 to a March 17, 2023 close of $0.42 per share – a decline of $0.15 per share, more than 25%. The effect on the shares continued into the next trading day, as shares closed at $0.30 per share on March 20, 2023, a decline of $0.12 per share, or more than

28%. Yet Sunlight's filing did not reveal the magnitude of Sunlight's economic exposure to those loans and thus did not fully disclose CRB's scheme.

61.    On April 3, 2023, Sunlight filed a Current Report on Form 8-K with the SEC announcing that Sunlight and CRB entered into a "Commitment and Transaction Support Agreement" as of April 2, 2023 whereby CRB again dramatically increased the total amount of its loan cap—this time from $450 million to *$650 million,* granted Sunlight certain grace periods, extended Sunlight a $100 million loan facility to be used to repay Sunlight's borrowings from Silicon Valley Bank, and received Warrants from Sunlight representing 19.9% of the shares outstanding.

62.    The April 3, 2023 Form 8-K further revealed that Sunlight was notified by the NYSE that it was no longer in compliance with its continued listing standards.

63.    On May 4, 2023, Sunlight filed its delayed Annual Report with the SEC on Form 10-K that, for the first time, quantified the losses on the Backbook loans revealing that Sunlight may incur negative platform fees *between $45.0 million and $55.0 million* in connection with a portfolio of funded but unsold loans the Bank Partner held at March 31, 2023.

64.    Also, on May 4, 2023, Sunlight issued an earnings release that revealed that as of March 31, 2023, Sunlight's CRB warehouse facility balance was a staggering ***$764 million***, far in excess of the then-current lending cap of $450 million. While Sunlight also announced that the balance had been reduced by a $296 million sale of Indirect Channel loans in sometime in April 2023, even with that sale, the Backbook balance stood at $468 million, above the prior $450 million limit. The effect of the sale served only to bring the balance within the new, increased $650 million cap. In addition, Sunlight simultaneously announced that the increase in the loan cap and extensions of maturity of the loans for an additional two years "*enable[es]* Sunlight to continue

originating loans in the Indirect Channel." (Italics added). These disclosures caused Sunlight's shares to decline by more than 4% on May 4, 2023, closing at $0.43 per share that day, down from a May 3, 2023 close of $0.45. Shares fell an additional 6% on May 5, 2023, closing at $0.40 per share.

65.     Then, just eleven days later, on May 15, 2023, Sunlight filed its delayed quarterly report with the SEC on Form 10-Q and issued an earnings release that tried to downplay Sunlight's dire financial picture and paint a rosy picture of its business prospects. The earnings release quoted Sunlight's CEO Matt Potere who stated he was "pleased we completed the Financing Agreements with [CRB] which position us to resolve our challenges from last year by strengthening our liquidity and enabling us to resume Indirect Channel loan sales. . ." and touted that in the first quarter of 2023, Sunlight funded an additional $627 million of solar and home improvement loans, "up 6% from the prior year period." In response to this news, Sunlight's shares fell $0.02 per share, or 5%, from a closing price of $0.38 per share on May 15, 2023 to a close of $0.36 per share on May 16, 2023.

66.     Thereafter, Sunlight's financial picture rapidly spiraled downward. On August 9, 2023, Sunlight's quarterly report with the SEC on Form 10-Q for the quarter ending June 30, 2023 revealed that its net tangible assets were negative by approximately $37 million meaning that Sunlight was essentially insolvent. On this news, Sunlight's shares plummeted from a closing price of $0.39 per share on August 9, 2023 to a closing price of $0.23 on August 10, 2023 – a decline of $0.16 per share, or more than 40%.

67.     On August 23, 2023, Sunlight announced a 1-for-20 reverse stock split.

68.     On September 13, 2023, Sunlight announced yet another amendment of its agreements with its Bank Partner CRB whereby CRB waived certain provisions of its prior loan

agreements including certain cash payments due on October 31, 2023, waived certain repurchase obligations, waived certain consequences of a Sunlight default of the agreements, revised requirements of certain loan sales, and revised the provisions that required Sunlight to maintain certain cash balances in its accounts with CRB.

69.     On September 28, 2023, Sunlight announced that it was suspended from trading and delisted by the New York Stock Exchange ("NYSE") as of September 25, 2023. It further announced a Change of Listing whereby its shares would be traded on OTC as of September 26, 2023.

70.     Finally, on October 31, 2023, Sunlight investors learned the true extent of CRB's fraudulent scheme to artificially inflate the price of Sunlight's shares to its own economic aggrandizement. On that date, Sunlight announced it had filed for Chapter 11 bankruptcy with a pre-packaged plan whereby CRB would provide exit financing in return for 12.5% of the New Equity in the reorganized company. Under the plan, the interests of Plaintiff and the other common stockholders of Sunlight were extinguished, meaning that the common stock held by Plaintiff and the members of the proposed Class was worthless. On this news, shares of Sunlight fell $0.13 per share, or 34%, from a closing price of $0.38 per share on October 30, 2023 to a close of $0.25 per share on October 31, 2023.

71.     After the Class Period, on December 7, 2023, Sunlight announced that the reorganization plan was approved. CRB emerged as a 12.5% owner of the New Equity while investors such as Plaintiff and the members of the proposed Class were left with nothing.

**ADDITIONAL SCIENTER ALLEGATIONS**

72.     During the Class Period, Defendant had both the motive and opportunity to commit fraud.  CRB was earning substantial profits as Sunlight's Bank Partner, lending relationship for

which CRB initially had no risk, as all of the economic risk for poor quality loans was shouldered by Sunlight. In addition to the substantial fees CRB charged to borrowers as a Bank Partner lender, CRB also benefitted by the substantial amount Sunlight was required to pay CRB on the principal balance of loans CRB originated CRB. Thus, CRB benefitted financially on multiple fronts, as the volume of loans it made and warehoused for Sunlight increased regardless of the credit quality of the borrower. As time passed and interest rates started to rise, the CRB Backbook loans became unsaleable other than at a deep discount, putting Sunlight at risk for failure. This meant that, although CRB was merely warehousing the Backbook loans and Sunlight was ultimately on the hook for their default, CRB was now at risk for the outstanding loans liability if Sunlight failed. Rather than let Sunlight fail, CRB enabled Sunlight to continue to lend at ever-increasing levels far exceeding its lending limits, and amending the lending caps after the fact.

73.     In addition, CRB had actual knowledge of the misleading nature of the statements made by Sunlight or acted in reckless disregard of the true information known to them at the time. In so doing, Defendant participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Sunlight's securities during the Class Period.

**LOSS CAUSATION**

74.     During the Class Period, as detailed herein, Defendant engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sunlight stock and operated as a fraud or deceit on Class Period purchasers of Sunlight stock by facilitating the build-up of loans to solar contractors of dubious credit quality, in addition to the build-up of an enormous Backbook of Indirect Channel Loans that CRB warehoused on its balance sheet but for which Sunlight retained the risk of loss. When Sunlight's true financial picture was revealed to investors

through a series of disclosures, the price of Sunlight stock fell precipitously and ultimately became worthless. As a result of their purchases of Sunlight stock during the Class Period, Plaintiff and the other Class Members suffered economic loss, i.e. damages, under the federal securities laws when the truth about Sunlight was revealed through the disclosures specified herein, which removed the false inflation from the price of Sunlight common stock.

75.     By employing the scheme described herein whereby CRB continued to grant ever increasing amounts of credit to Sunlight, repeatedly lifted its loan caps, and waived defaults under its agreements with Sunlight, with knowledge that such defaults and Sunlight's unsustainable debt load were being concealed from Sunlight's investors, and for no legitimate business purpose other than the substantial fees as a lender in addition to the fee Sunlight was obligated to pay to CRB based on loan volume.  Defendant participated in a scheme to defraud Sunlight investors that had the intended effect and caused Sunlight stock to trade at artificially inflated levels throughout the Class Period.

76.     As a direct result of the disclosures identified herein, the price of Sunlight stock fell precipitously, causing real economic loss to investors who had purchased Sunlight stock at artificially inflated prices during the class period.

77.     The stock price declines identified above were a direct result of the nature and extent of Defendant's fraud being revealed to investors. The timing and magnitude of the price declines in Sunlight stock negate any inference that the losses suffered by the Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or facts unrelated to Defendant's fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendant's fraudulent scheme to

artificially inflate the price of Sunlight stock and the subsequent significant decline in the value of Sunlight stock when Defendant's fraudulent conduct was revealed.

### THE PRESUMPTION OF RELIANCE

78.     At all relevant times, the market for Sunlight stock was an efficient market for the following reasons, among others:

(a)     Sunlight stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)     as a regulated issuer, Sunlight filed periodic public reports with the SEC;

(c)     Sunlight regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Sunlight was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

79.     As a result of the foregoing, the market for Sunlight stock promptly digested current information regarding Sunlight from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Sunlight stock during the Class Period suffered similar injury through their purchase of Sunlight stock at artificially inflated prices and a presumption of reliance applies under the fraud-on-the-market doctrine.

80.     Alternatively, a Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims include allegations concerning omissions. Because this action at least in part involves Sunlight's failure to disclose material adverse information regarding its exposure to the CRB Backbook, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Sunlight's material Class Period omissions regarding, among other things, its exposure to its Backbook, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Sunlight stock during the Class Period of January 25, 2021 through and including October 31, 2023 (the "Class"). Excluded from the Class is CRB; its officers and directors, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendant has or had a controlling interest.

82.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Sunlight shares traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained

by Sunlight or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

83.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class which predominate over questions that may affect individual Class members include:

> a.   whether Defendant violated the 1934 Act;
>
> b.   whether Defendant employed a device, scheme, or artifice to defraud, or engaged in an act, practice or course of business which operated as a fraud or deceit;
>
> c.   whether Defendant knew or recklessly disregarded that it employed a device, scheme, or artifice to defraud, or engaged in an act, practice or course of conduct which operated as a fraud or deceit;
>
> d.   whether the price of Sunlight stock was artificially inflated; and
>
> e.   the extent of damages sustained by Class members and the appropriate measure of damages.

84.     Plaintiff's claims are typical of those of the Class because Plaintiff and the other Class members sustained damages from Defendant's wrongful conduct.

85.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

86.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and**

**Rule 10b-5(a) and (c) Promulgated Thereunder**

87.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88.     This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege in this Count nor prove in this case that Defendant made any misrepresentations or omissions of material fact for which it may also be liable under Rule 10b-5(b) and/or any other provisions of law. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.     During the Class Period, Defendant carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate the market price of Sunlight securities; and (iii) cause Plaintiff and the Class to purchase Sunlight securities at artificially inflated prices.

90.     In furtherance of this unlawful plan, scheme and course of conduct, Defendant employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of Sunlight stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

91.     Defendant's fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included furnishing false and misleading statements that were used in public statements made by Sunlight to Plaintiff and the Class.

92.     Plaintiff and the Class reasonably relied upon the integrity of the market in which Sunlight securities traded.

93.     During the Class Period, Plaintiff and the Class were unaware of Defendant's fraudulent scheme and unlawful course of conduct. Had Plaintiff and the Class known of Defendant's unlawful scheme and unlawful course of conduct, they would not have purchased Sunlight securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

94.     As a direct and proximate result of Defendant's scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their purchases of Sunlight securities during the Class Period.

95.     By reason of the foregoing, Defendant violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and is liable to Plaintiff and the Class for damages suffered in connection with their purchases of Sunlight securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative;

b.   Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

c.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in the action, including counsel fees and expert fees, and

d.   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 27, 2024                Respectfully submitted,

                                         */s/ Paul Scarlato*
                                         Paul J. Scarlato, Esq. (NJ ID 041921986)
                                         ROSCA SCARLATO LLC
                                         161 Washington Street, Suite 1025
                                         Conshohocken, PA 19428
                                         Telephone: (216) 946-7070
                                         E-mail: pscarlato@rscounsel.law

                                         Alan L. Rosca, Esq.
                                         ROSCA SCARLATO LLC
                                         2000 Auburn Dr. Suite 200
                                         Beachwood, OH 44122
                                         Telephone: (216) 946-7070
                                         E-mail: arosca@rscounsel.law

                                         Michael Dell'Angelo
                                         Andrew D. Abramowitz
                                         BERGER MONTAGUE PC
                                         1818 Market Street, Suite 3600
                                         Philadelphia, PA 19103
                                         Telephone: (215) 875-3000
                                         mdellangelo@bm.net
                                         aabramowitz@bm.net

                                         *Counsel for Plaintiff and the Proposed Class*