**Not for Publication**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

MITCHELL WAX,

        **Plaintiff,**

        v.

CROSS RIVER BANK,

        **Defendant.**

**Civil Action No.: 24-9510 (ES) (JRA)**

**OPINION**

SALAS, DISTRICT JUDGE

### I.    BACKGROUND

Before the Court is Defendant Cross River Bank's ("CRB" or "Defendant") motion to dismiss Lead Plaintiff Mitchell Wax's ("Plaintiff") Complaint (D.E. No. 1 ("Complaint" or "Compl.")). (D.E. No. 39 ("Motion to Dismiss" or "Mot."); D.E. No. 39-1 ("Mov. Br.")). Plaintiff filed an opposition, (D.E. No. 40 ("Opp. Br.")), and Defendant filed a reply, (D.E. No. 41 ("Reply Br.")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, Defendant's Motion is **GRANTED**, and Plaintiff's Complaint is **DISMISSED** *without prejudice*.

#### A.    Factual Allegations

Plaintiff initiated this putative class action against Defendant CRB on behalf of all people who purchased or otherwise acquired the securities of "Sunlight and/or Spartan (collectively, 'Sunlight')" between January 25, 2021, and October 31, 2023 (the "Class Period"). (Compl. ¶ 1). Sunlight used a proprietary technology platform called Orange to provide "residential solar and home improvement contractors the ability to offer point-of-sale financing to [their] customers

when purchasing residential solar systems." (*Id.* ¶ 4).  Sunlight's revenue came from a "platform fee" for each loan it facilitated.  (*Id.* at ¶¶ 4 & 13).[1]

Sunlight used two different kinds of channels to facilitate loans: the direct channel and the indirect channel.  (*Id.* ¶¶ 5–6).  In the former, direct channel partners—often, banks and credit unions—"fund[ed] Sunlight-facilitated solar or home improvement loans one-by-one directly onto their balance sheet via Orange[,]" using "their own credit criteria.  (*Id.* ¶¶ 5 & 34).  Direct channel partners generally chose to service the loans that they generated.  (*Id.* ¶ 34).  Sunlight then "earn[ed] [the] difference between cash paid to Sunlight by the lender and the amount given to contractor." (*Id.*).

In the indirect channel, Sunlight arranged for its issuing bank partner—CRB—to originate loans. (*Id.*).  Based on program agreements between Sunlight and CRB, Sunlight would pay CRB a fee based on the balance of the loans that CRB generated.  (*Id.*).  Then, CRB would fund the loans by remitting funds to Sunlight, who would make payments to the contractor.  (*Id.*).  Sunlight would then arrange for the sale of indirect channel loans originated by CRB to third party purchasers.  (*Id.*).  Sunlight "recognize[d] revenue from . . . platform fees on Indirect Channel Loans when the Indirect Channel Purchaser [bought] the Loans from the balance sheet of the Bank Partner [CRB]." (*Id.* ¶ 36).  By the terms of the agreement between CRB and Sunlight, Sunlight "guarantee[d] the performance of certain Indirect Channel Loans" and was "required to repurchase [those loans] in the event Sunlight [was] unable to facilitate [their] sale." (*Id.*).  Plaintiff alleges

---

[1]      "Sunlight earns a platform fee on each solar and home improvement loan facilitated through Orange®. The platform fee is generally equal to the difference, or the margin, between (i) the contractor fee that Sunlight charges to contractors for access to Orange® and for making the various Sunlight-offered loan products available to such contractors and (ii) the capital provider discount charged by the relevant capital provider either funding or purchasing the loan in the direct and indirect channels, respectively." (Compl. ¶ 37).

that Sunlight therefore "retained full economic exposure to the Backbook[2] until the loans were sold, and only profited when the price that the loan purchaser paid for the Indirect Channel Loans exceeded CRB's cost basis in the loans." (*Id*. ¶ 41).

Plaintiff quotes the following language from "Sunlight's public filings[,]"[3] which explain this business arrangement:

> Indirect Channel Loans—Sunlight arranges for Loans to be originated by Sunlight's issuing Bank Partner. Sunlight entered into program agreements with Bank Partners. Sunlight pays its Bank Partner a fee based on balance of Loans originated by the Bank Partner. The Bank Partner funds loans by remitting funds to Sunlight, and Sunlight is responsible for making payments to the contractor. Sunlight arranges for sale of Indirect Channel Loans to third party purchasers.
>
> Revenue Recognition—Sun recognizes revenue from (a) platform fees on Indirect Channel Loans when the Indirect Channel Purchaser buys the Loans from the balance sheet of the Bank Partner, and loan portfolio and management services monthly as Sun provides such services.
>
> In the indirect channel, Sunlight's solar loan allocation engine directs the solar loans to be funded on the balance sheet of Sunlight's intermediary bank partner. These loans are aggregated, pooled and sold to indirect channel capital providers that cannot, or do not wish to, directly originate solar loans.

(*Id*. ¶¶ 34, 36). Regarding Sunlight's exposure to liability for these loans, Plaintiff quotes:

> Sunlight is required to guarantee the performance of certain Indirect Channel Loans, which it is required to repurchase in the event Sunlight is unable to facilitate the sale of such loans.
>
> Sunlight is obligated to repurchase non-performing loans originated by its bank partner from the date of origination to the date the loans are purchased from Sunlight's bank partner by a Sunlight indirect channel capital provider. Sunlight does not record loans originated

---

[2]    Plaintiff identifies the "CRB Backbook" as the "loans that were mispriced at below-market rates and/or fixed interest rates, all of which were quickly decreasing in value as interest rates continued to rise." (Compl. ¶ 8).  The liabilities for these loans, originated through Sunlight's indirect channel, were "warehoused on the CRB Backbook." (*Id*. ¶ 9).

[3]    Plaintiff does not identify which public filing these quotes originate from.  (*See generally* Compl.).

by its bank partner on its consolidated balance sheets (as Sunlight is not the originator of the loans), but Sunlight does record a liability for the losses Sunlight reasonably expects to incur in connection with Sunlight's guarantee of its bank partner. . .

The terms of Sunlight's bank partnership arrangement provide that such sales must occur within a certain period of time, subject to certain exceptions (180 days from origination for solar system loans . . . While Sunlight has not been required to date to purchase solar system loans from its bank partner due to the expiration of Sunlight's bank partner's agreed hold period, Sunlight cannot be certain that fluctuations in the credit markets or other market, regulatory or business factors will not impede Sunlight's ability to source such third-party purchasers in the future, which could result in Sunlight being required to purchase all or part of unsold solar system loans.

(Compl. ¶¶ 36, 38–39).

As interest rates rose and "Sunlight's financial condition deteriorated" throughout 2021 and 2022, CRB "repeatedly extended enormous amounts of credit to Sunlight and its unscrupulous solar panel installers of dubious credit quality." (*Id*. ¶ 23). CRB "increased its loan limits and enabled Sunlight to exceed those limits, and held such loans on its own balances sheet, thus knowingly allowing and enabling Sunlight to hide its exposure to the solar Backbook from its investors." (*Id*.). Plaintiff alleges this conduct—CRB's "scheme"—was "employed for no legitimate purpose other than for CRB to benefit itself in terms of the substantial fees it charged to borrowers as a lender, as well as the fees Sunlight was obligated to pay to CRB based on loan volume." (*Id*.). Meanwhile, "[n]either Sunlight nor CRB disclosed to Plaintiff and the Class the magnitude of that risk or, when interest rates increased, the extent of Sunlight's mounting off-balance sheet liabilities (which were being warehoused on the balance sheet of Sunlight's Bank Partner, CRB)." (*Id*. ¶ 7). Instead, Plaintiff alleges, "CRB . . . knowingly granted ever-increasing amounts of credit to Sunlight and its contractors[,] repeatedly lifted its loan caps, and waived defaults under its agreements with Sunlight, all with knowledge that such defaults and Sunlight's

4

unsustainable debt load were being concealed from Sunlight's investors." (*Id.* ¶ 48). Plaintiff claims that "CRB benefitted financially on multiple fronts, as the volume of loans it made and warehoused for Sunlight increased regardless of the credit quality of the borrower." (*Id.* ¶ 72). Indeed, "[r]ather than let Sunlight fail, CRB enabled Sunlight to continue to lend at ever-increasing levels far exceeding its lending limits, and amending the lending caps after the fact." (*Id.*).

Plaintiff alleges that, "[w]hen Sunlight's true financial picture was revealed to investors through a series of disclosures, the price of Sunlight stock fell precipitously and ultimately became worthless." (*Id.* ¶ 74). On September 28, 2022, "Sunlight announced that it was taking a non-cash advance receivable impairment of $30 to $33 million stemming from liquidity issues by one installer. Sunlight's stock price plummeted 57%, or $1.44 per share, on the news, falling from a closing price of $2.52 per share on September 28, 2022 to a close of $1.08 per share on September 29, 2022." (*Id.* ¶ 11). On November 14, 2022, Sunlight issued reports that "revealed for the first time" that "rising interest rates were having a material negative impact on Sunlight's existing loan portfolio." (*Id.* ¶ 50–51). Sunlight reported that it was "considering a range of strategic alternatives," including selling the company. (*Id.* ¶ 52). On December 13, 2022, Sunlight filed a Current Report on Form 8-K with the SEC announcing an amendment to its agreement with CRB "which provided for, among other things, a more than doubling of the loan capacity CRB was willing to extend to Sunlight, from $210 million to $450 million." (*Id.* ¶¶ 12 & 54–55). Sunlight also "for the first time, revealed the existence of the Backbook." (*Id.* ¶ 56).

On March 17, 2023, Sunlight "filed a Notice of Late Filing of its Annual Report with the SEC, revealing that it anticipated a significant change in its financial results for the fiscal year ended December 31, 2022, compared to the fiscal year ended December 31, 2021." (*Id.* ¶¶ 13 & 59–60). Plaintiff alleges that this filing "sent Sunlight's share price reeling"—even though it "did

not reveal any information about the magnitude of Sunlight's economic exposure to those Backbook loans and thus did not fully disclose CRB's scheme." (*Id.*).[4] On April 3, 2023, "Sunlight announced that CRB increased its loan capacity yet again from $450 million to $650 million as of April 2, 2023." (*Id.* ¶ 14; *see also id.* ¶ 61). Additionally, "Sunlight was notified by the NYSE that it was no longer in compliance with its continued listing standards." (*Id.* ¶ 62).

On May 4, 2023, "Sunlight quantified for the first time the losses stemming from the Backbook loans, revealing that Sunlight could incur negative platform fees between $45.0 million and $55.0 million in connection with a portfolio of funded but unsold loans held by Sunlight's Bank Partner CRB at March 31, 2023." (*Id.* ¶ 15; *see also id.* ¶ 63). That same day, "Sunlight issued an earnings release that revealed that, as of March 31, 2023, Sunlight's CRB warehouse facility balance was a staggering $764 million, far in excess of the then-current lending cap of $450 million." (*Id.* ¶ 16; *see also* ¶ 64). On May 15, 2023, Sunlight "issued an earnings release that tried to downplay Sunlight's dire financial picture and business prospects." (*Id.* ¶ 17; *see also* ¶ 65). Throughout the next several months, "Sunlight's financial picture rapidly spiraled downward." (*Id.* ¶¶ 18–19 & 67).

Plaintiff alleges that, "[o]n September 13, 2023, Sunlight announced yet another amendment of its agreements with its Partner Bank CRB whereby CRB had waived certain provisions of its prior loan agreements, including certain cash payments due on October 31, 2023; a waiver of certain repurchase obligations; a waiver of certain consequences of a Sunlight default of the agreements; revisions to requirements of certain loan sales; and revisions to the provisions that require Sunlight to maintain certain cash balances in its accounts with CRB." (*Id.* ¶ 20; *see*

---

[4] Additionally, Sunlight filed a Current Report on Form 8-K with the SEC which reported that Sunlight was not currently in compliance with certain provisions of its agreements with CRB, including the loan cap. (Compl. ¶ 58).

*also* ¶ 68).  Plaintiff claims that investors finally learned of "CRB's fraudulent scheme" on October 31, 2023, when "Sunlight announced it had filed for Chapter 11 bankruptcy with a pre-packaged plan whereby CRB would provide exit financing in return for 12.5% of the New Equity in the reorganized company."  (*Id*. ¶ 22; *see also* ¶ 70).

### B.      Procedural History

Lead Plaintiff Mitchell Wax initiated this putative class action against Defendant Cross River Bank on September 27, 2024.  (*See generally* Compl.).  On July 25, 2025, Cross River Bank moved to dismiss the complaint.  (*See generally* Mot.).  Pursuant to the briefing schedule ordered by the Court, (D.E. No. 38), on the same day, Plaintiff filed an opposition, (*see generally* Opp. Br.), and Defendant replied, (*see generally* Reply Br.).

## II.      LEGAL STANDARD

### A.      Rule 12(b)(6)

In assessing whether a complaint states a cause of action sufficient to survive dismissal under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  "[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded.  *Id*. at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

7

While the Court generally "may not consider matters extraneous to the pleadings" when deciding a Rule 12(b)(6) motion, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted), an exception to this general rule provides that the Court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (noting that pursuant to Rule 12(b)(6) the Court "may consider documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case'" (alteration in original) (first citing *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 559 (3d Cir. 2002); and then quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004))).

### B.      Rule 9(b)

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement concerning allegations of fraud. *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 435 (D.N.J. 2012). Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he law does not require specificity just for specificity's sake"; rather, "[t]he level of particularity required is sufficient details to put [d]efendants on notice of the 'precise misconduct with which they are charged.'" *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 104 (D.N.J. 2011) (quoting *Franulovic v. Coca Cola Co.*, No. 07-0539, 2007 WL 3166953, at *11 (D.N.J. Oct. 25, 2007)). In other words, to satisfy Rule 9(b)'s specificity requirement, "the pleadings must state what the misrepresentation was, what was purchased, when the conduct complained of occurred,

8

by whom the misrepresentation was made, and how the conduct led plaintiff to sustain an ascertainable loss." *Id.* (quoting *Zebersky v. Bed Bath & Beyond, Inc.*, No. 06-1735, 2006 WL 3454993, at *4 (D.N.J. Nov. 29, 2006)). The Third Circuit has advised that, "at a minimum," a plaintiff must support allegations of fraud "with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1422); *see also United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016).

### C.    Private Securities Litigation Reform Act ("PSLRA") Pleading Requirements

Congress "impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b–5" in § 21D(b) of the PSLRA. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006). Pursuant to that standard, plaintiffs must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," § 78u–4(b)(2). *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007). Furthermore, "[t]he interplay between Rule 12(b)(6), and Rule 9(b) and the PSLRA is important. Failure to meet the threshold pleading requirements demanded by the latter provisions justifies dismissal apart from Rule 12(b)(6). Accordingly, 'unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations—inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis.'" *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 145 (3d Cir. 2004) (quoting *In re Rockefeller*

9

*Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 224); *see also id.* at 217 ("The particularity described in § 78u–4(b)(1) extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading.").

### III.    DISCUSSION[5]

Defendant argues that Plaintiff's claims—brought only against Defendant CRB, and not against third-party Sunlight—amount to "no more than a claim for 'aiding and abetting liability,' for which there is no private right of action under Rule 10b-5." (Mov. Br. at 1 (quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 185, 191 (1994)). Defendant contends that because "CRB was not a 'maker' of any alleged challenged statement, . . . CRB cannot be liable under Rule 10b-5 as a 'primary violator.'" (*Id*. (quoting *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 143-44 (2011)). Defendant identifies that Plaintiff alleges "CRB 'enabled,' 'helped,' or 'allowed' Sunlight to mislead investors through its lending program with Sunlight"—which Defendant argues "is just another way of alleging that CRB aided and abetted allegedly misleading public statements by Sunlight." (*Id*. at 12 (quoting Compl. ¶¶ 1, 7, 9–10, 23, & 72–73)). Defendants assert that "[a]ccording to the [C]omplaint, CRB violated the federal securities laws solely by participating in a supposed 'scheme' with Sunlight to 'conceal' information from Sunlight's own investors; the alleged 'scheme' was effectuated through public statements that were 'made by Sunlight' and by Sunlight alone." (*Id*. at 14 (quoting Compl. ¶ 91)). Neither, Defendant argues, can Plaintiff avoid this result "by portraying his claim

---

[5]    "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory*, 114 F.3d at 1426 (citation omitted). The Court, however, may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer*, 605 F.3d at 230. Under this standard, the Court considers each of the exhibits attached to Defendant's Motion to Dismiss, (D.E. Nos. 39-3–11), and the exhibits attached to Plaintiff's Opposition Brief, (D.E. Nos. 40-1–2).

as one for 'scheme liability' under Rules 10b-5(a) or 10b-5(c)." (Mov. Br. at 2 (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 161 (2008)). And, in any event, Defendant contends that "at least six separate legal flaws . . . require [P]laintiff's 'scheme' claim to be dismissed": (i) Plaintiff "cannot plead reliance as a matter of law[,]" (*id*. at 15); (ii) "the alleged purpose of the 'scheme' was to make public misrepresentations or omissions[,]" (*id*. at 18); (iii) Plaintiff "does not allege facts supporting a 'strong inference' of scienter[,]" (*id*. at 19); (iv) the Complaint "does not plead any 'inherently deceptive' conduct[,]" (*id*. at 21); (v) Plaintiff lacks standing and has failed to plead loss causation, (*id*. at 22); and (vi) Plaintiff has not alleged fraud with sufficient particularity, (*id*. at 23).

In opposition, Plaintiff argues that "CRB's arguments in favor of dismissal seek to incorrectly reframe Plaintiff's scheme liability claim brought . . . under . . . Rule[s] 10b(a) and (c)—a claim of primary liability for CRB's own conduct—as one of aiding-and-abetting." (Opp. Br. at 2). Plaintiff contends that he "alleges a series of deceptive acts by CRB[,]" including that CRB "'knowingly allow[ed] and enable[d] Sunlight to hide its exposure to the solar Backbook from its investors'" and "'deceived the investing public as to Sunlight's business and prospects.'" (*Id*. at 14 (quoting Compl. ¶ 23)). Plaintiff further argues that the Complaint sufficiently alleges "'a causal connection between [CRB]'s alleged misconduct and [P]laintiff's injury,' which is all that is required by the scheme liability reliance element." (*Id*. at 16 (quoting *In re Cognizant Tech. Sols. Corp. Sec. Litig*., No. 16-6509, 2020 WL 3026564 (D.N.J. June 5, 2020))). Plaintiff asserts that "[s]cheme liability reliance is adequately alleged where a scheme defendant's participation in the scheme makes it 'necessary or inevitable' that falsehoods on the part of [the issuer] would result[,]" and that, here, "CRB's conduct made it inevitable that falsehoods on the part of Sunlight

11

would result." (*Id*. at 18–19 (quoting *In re Eletrobras Sec. Litig*., 245 F. Supp. 3d 450, 472 (S.D.N.Y. March 27, 2017)).

Defendant replies that "Plaintiff is not the first to argue that he can sidestep *Central Bank* by pleading his claims as a 'scheme.'" (Reply Br. at 2). Defendant points to *Stoneridge*, "where the [United States Supreme] Court held that allegations about undisclosed conduct by a supplier of set-top boxes to an issuer in the cable television business were 'too remote to satisfy the requirement of reliance.'" (Reply Br. at 2); *see also* 552 U.S. 148 (2008). Further, Defendant argues that "[t]he opposition fails to acknowledge, much less explain away, [P]laintiff's admission that Sunlight investors 'were unaware of' the alleged CRB conduct that is the basis for plaintiff's securities fraud claims[,]" and that this admission is fatal because, "[i]n *Stoneridge*, the Court held that undisclosed 'deceptive acts' by third-party business partners of a securities issuer, as CRB was to Sunlight here, were 'too remote to satisfy the requirement of reliance.'" (*Id*. at 3 (first citing Compl. ¶¶ 3, 93; and then quoting *Stoneridge*, 552 U.S. at 160–61)). Defendant additionally asserts that Plaintiff relies on *Cognizant* and *Electrobras* in error, as both involve "scheme" claims asserted against insiders—not third-parties—who engaged in acts immediate to the injury. (*Id*. at 4 (first citing *Cognizant*, 2020 WL 3026564; and then citing *Eletrobras*, 245 F. Supp. 3d at 472)).

Section 10(b) of the Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [, of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Pursuant to this section, the SEC promulgated Rule 10b–5, which makes it unlawful "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act,

12

practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b–5.[6] To state a securities fraud claim pursuant to Section 10(b) and Rule 10b-5, a plaintiff "must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

To state a claim under Rule 10b-5(a) or (c) in particular, "a plaintiff must allege that the defendant (1) committed a manipulative or deceptive act, (2) in furtherance of [an] alleged scheme to defraud, (3) scienter, (4) and reliance." *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 661 (D.N.J. Nov. 12, 2009). Such claims "must comply with the heightened pleading requirements of" Rule 9(b) and the PSLRA. *Stichting Pensioenfonds ABP v. Merck & Co.*, No. 05-5060, 2012 WL 3235783 (D.N.J. Aug. 1, 2012). Section 10(b) does not require a specific oral or written statement; conduct itself can be deceptive. Nevertheless, "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Id*. (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 243 (1988)). "Reliance, also known as transaction causation, 'establishes that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security.'" *In re DVI, Inc. Sec. Litig.*, 639 F.3d at 631 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001), *as amended* (Oct. 16, 2001)). A rebuttable presumption of reliance exists where (i) plaintiff alleges an omission of a

---

[6]    Plaintiff asserts violations of Rule 10b-5(a) and (c), but not Rule 10b-5(b). The Court refers to claims under Rule 10b–5(a) and (c) as "scheme liability claims" "because they make deceptive conduct actionable, as opposed to Rule 10b–5(b), which relates to deceptive statements." *See In re DVI, Inc. Sec. Litig.*, 639 F.3d at 643 n.29 (3d Cir. 2011), *abrogated on other grounds by Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013).

13

material fact by one with a duty to disclose; or (ii) the statements at issue become public. *Id*. at 769.

In *Central Bank*, the United States Supreme Court determined that the Section 10(b) private right of action did not extend to claims against aiders and abettors. *Cent. Bank of Denver*, 511 U.S. 16 at 191. Since this ruling, "many plaintiffs have . . . advanced 'scheme liability' claims under Rule 10b–5(a) and (c) to reach secondary actors, who may have been integrally involved in furthering the fraudulent scheme, but who made no public statements." *In re DVI, Inc. Sec. Litig.*, 639 F.3d at 643 n.29. Evaluating one such claim, the Supreme Court clarified that, even assuming a plaintiff adequately alleged that a scheme liability defendant committed a deceptive act, "reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge*, 552 U.S. at 159; *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d at 645. The Supreme Court held the following:

> In all events we conclude respondents' deceptive acts, which were not disclosed to the investing public, are too remote to satisfy the requirement of reliance. It was Charter, not respondents, that misled its auditor and filed fraudulent financial statements; nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did.

*Id*. at 161. The Third Circuit thereafter held that *Stoneridge* was "primarily focused on whether investors were aware of, and relied on, the defendants' own conduct" and that, in *Stoneridge*, "the fact that the vendors' conduct was not 'disclosed to the public,' is what made it too remote to invoke a presumption of reliance." *In re DVI, Inc. Sec. Litig.*, 639 F.3d at 646–47 (first quoting *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 149 (2d Cir. 2010); and then citing *Stoneridge*, 552 U.S. at 161). Accordingly, to survive Defendant's Motion to Dismiss, Plaintiff must adequately allege that CRB engaged in a deceptive act "within the reach of the § 10(b) private

14

right of action[,]" *Stoneridge*, 552 U.S. at 158, and that the public relied on CRB's own deceptive conduct, *In re DVI, Inc. Sec. Litig.*, 639 F.3d at 648.

Nowhere in the Complaint does Plaintiff allege that CRB ever made a public statement to Sunlight investors. (*See, e.g.*, Compl. ¶¶ 73 & 91). Instead, Plaintiff claims that CRB "furnish[ed] false and misleading statements that were used in public statements made by Sunlight to Plaintiff and the Class." (*Id.* ¶ 91). Accordingly, to the extent Plaintiff suggests CRB may be liable under Rule 10b-5(b) for public statements made by Sunlight, the Complaint fails.[7] *See Janus*, 564 U.S. at 143 ("Rule 10b–5's private right of action does not include suits against aiders and abettors. Such suits—against entities that contribute "substantial assistance" to the making of a statement but do not actually make it—may be brought by the SEC, but not by private parties." (citation modified)); *see also Trustcash*, 668 F. Supp. 2d at 661 ("The Court notes that Plaintiffs do not point to any misstatement or omission of a material fact by Defendants. As a result, Plaintiffs have not [pled] a set of facts that would entitle them to relief under Rule 10b–5(b)."). Indeed, to hold otherwise "would substantially undermine *Central Bank*" and impermissibly allow Section 10(b) liability based merely on alleged aiding and abetting. *Janus*, 564 U.S. at 143.

To be sure, "[c]onduct itself can be deceptive" and liability under Rule 10b-5(a) and (c) does not require an "oral or written statement." *Stoneridge*, 552 U.S. at 158–59. Even so, Plaintiff must allege an actionable scheme predicated on "inherently deceptive" conduct to survive Defendant's motion to dismiss. *See Trustcash*, 668 F. Supp. 2d at 661; *see also*, *e.g.*, *In re RenovaCare, Inc. Sec. Litig.*, No. 21-13766, 2024 WL 2815034, at *23 (D.N.J. June 3, 2024) ("Plaintiffs have adequately pled claims for scheme liability against the RenovaCare Defendants

---

[7]    "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142.

15

by alleging a pump-and-dump scheme.").  At this juncture, it is unclear to the Court what deceptive conduct, exactly, Plaintiff alleges that CRB engaged in.  Plaintiff argues that CRB "'knowingly allow[ed] and enable[ed] Sunlight to hide its exposure to the solar Backbook from its investors'" and "'deceiv[ed] the investing public as to Sunlight's business and prospects.'"  (Opp. Br. at 14 (quoting Compl. ¶ 23)).  But a scheme liability claim cannot lie where "the primary purpose and effect" of the alleged "scheme [was] to make a public misrepresentation or omission[.]"  *Takata v. Riot Blockchain, Inc.*, 2023 WL 7133219, at *11 (D.N.J. Aug. 25, 2023) (quoting *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. Sept. 25, 2020) ("Courts have routinely rejected [plaintiffs'] attempt[s] to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'")); (*see also* Mov. Br. at 18).

These issues alone suffice to dismiss Plaintiff's Complaint at this stage.  But even if Plaintiff had adequately alleged that Defendant engaged in actionable deceptive conduct, Plaintiff has failed to claim that he relied on any such conduct.  In fact, as Defendant identifies, "[t]he premise of plaintiff's claim is that CRB's alleged conduct was ***unknown to Sunlight investors***." (Mov. Br. at 17 (citing Compl. ¶¶ 3, 93)).  The Court is likewise unpersuaded by Plaintiff's argument that CRB's alleged fraudulent conduct "made Sunlight's misstatements and omissions inevitable" under the *Stoneridge* standard.  (Opp. at 20).  *See Pac. Inv. Mgmt. Co. LLC*, 603 F.3d at 159 ("What is clear from *Stoneridge* . . . is that the mere fact that the ultimate result of a secondary actor's deceptive course of conduct is communicated to the public through a company's financial statements is insufficient to show reliance on the secondary actor's *own* deceptive conduct. Because that is all plaintiffs have alleged here, we are bound by the Supreme Court's holding in *Stoneridge.*") (adopted by *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011)).

16

Neither is the Court convinced that CRB's status as an "indirect channel provider"—rather than a "supplier" or "customer" of the issuer—renders *Stoneridge* inapposite.  (Opp. Br. at 18).  In short, Plaintiff has not alleged facts that sufficiently show, let alone with Rule 9(b) particularity, that any action CRB took made it necessarily or inevitable for Sunlight to perpetrate any fraud on its investors—even if the Court were to assume, without deciding, that such a fraud indeed occurred.[8]

Even so,  Federal Rule of Civil Procedure 15(a)(2) provides that the Court "should freely give leave [to amend a pleading] when justice so requires."  However, no amendment should be permitted if an amendment would be futile.  *See Harrison Beverage Co. v. Dribeck Imp., Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990).  Because the deficiencies the Court has identified may be cured by amendment and the Court does not find that repleading would be futile at this early stage, the Court **DISMISSES** Plaintiff's claim *without prejudice*.  The Court cautions Plaintiff that failure to cure the deficiencies noted in the Court's Opinion may result in the dismissal of Plaintiff's claims *with prejudice*.

## IV.    CONCLUSION

Based on the foregoing, Defendant's Motion to Dismiss is **GRANTED**.  Plaintiff's Complaint is **DISMISSED** *without prejudice*.  An appropriate Order accompanies this Opinion.

**Dated: April 1, 2026**                           *s/ Esther Salas*
                                                                       **Esther Salas, U.S.D.J.**

---

[8]    The parties further dispute whether Plaintiff has met the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure for a Rule 10b–5(b) claim, including a proper pleading of scienter, economic loss, and loss causation.  They additionally disagree regarding whether the Sunlight bankruptcy plan injunction bars Plaintiff's claims and whether the class-wide release in the Sunlight securities class action applies.  (*See, e.g.*, Reply Br. at 10–11).  However, as the Court dismisses the Complaint on other grounds, discussed herein, it need not reach these issues today.